**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**HATTIESBURG DIVISION**

| | | |
|---|---|---|
| **GREG LUCKETT** | § | **PLAINTIFF** |
| | § | |
| **v.** | § | **CAUSE NO. 2:05CV2186-LG-JMR** |
| | § | |
| **HOME DEPOT, U.S.A., INC.** | § | **DEFENDANT** |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND**
**DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AND DENYING DEFENDANT'S MOTION TO STRIKE**

BEFORE THIS COURT is Defendant Home Depot, U.S.A., Inc.'s Motion for

Summary Judgment [77], filed August 29, 2007 and its Motion to Strike [105], which was

not filed until November 8.  Plaintiff Greg Luckett initiated this action alleging employment

discrimination and intentional infliction of emotional distress on account of his race and

efforts in reporting discriminatory conduct.  Home Depot argues (1) it had a legitimate

nondiscriminatory reason for firing Luckett, (2) he admits no complaints about his pay, (3)

his retaliation claim is barred, and (4) he did not witness any discriminatory or outrageous

conduct.  The Court has considered the parties' briefs, the record, and the relevant legal

authority.  The motion for summary judgment is granted in part and denied in part.  The

motion to strike is denied.[1]

**FACTS AND PROCEDURAL HISTORY**

This case is one of seven[2] presently before the Court.  All seven plaintiffs allege

---

[1]This was not filed until Luckett sought to amend the affidavits he submitted.
Nevertheless, the motion to strike is denied on its merits.

[2]*Viverette v. Home Depot, U.S.A., Inc.*, No. 2:05cv368-LG-JMR; *Swanier v. Home Depot,
U.S.A., Inc.*, No. 2:05cv2071-LG-JMR; *Jones v. Home Depot, U.S.A., Inc.*, No. 2:05cv2084-LG-
JMR; *Patrick v. Home Depot, U.S.A., Inc.*, No. 2:05cv2185-LG-JMR; *LeSure v. Home Depot,*

employment discrimination at Home Depot's Hattiesburg, Mississippi store, between 2004 and 2005.  The cases were consolidated for discovery purposes.  Home Depot filed motions for summary judgment in all seven cases.  As relevant, the Court incorporates by reference the findings and procedural history set forth in the opinions in these cases, which are being filed contemporaneously with the instant opinion and order.  The Court will state additional facts as necessary for this individual case.

Luckett (an African-American) worked for Home Depot as a human resources manager between February 2003, and August 21, 2005.  Among other things, his duties included employee training and discipline.  He started at two of Home Depot's Baton Rouge stores, then was transferred to the Denham Springs, Louisiana store.  While there, he received a performance review of "very good," which earned him a $2,800 per year raise.  After reporting his store manager for having a relationship with a subordinate, Luckett was transferred to the Hattiesburg store.

His tenure at the Hattiesburg store began in June 2004.  George Garza (Hispanic) was his store manager and immediate supervisor.  Above Garza, Luckett's up-the-line supervisors were Regional Human Resources Managers Elzie Berry and Danielle Lombard (African-Americans), Regional Human Resources Director Elizabeth De La Pena (Hispanic), and Employment Practices Manager Tammy Esskew (Caucasian).

Beginning in January 2005, Luckett began complaining to Lombard, De La Pena, and Esskew about Garza.  Among other things, the complaints included pay, raise, and promotion

---

*U.S.A., Inc.*, No. 2:05cv2187-LG-JMR; *Smith v.  Home Depot, U.S.A., Inc.*, No. 2:05cv2188-LG-JMR.  The first three were filed June 2, September 27, and October 14, 2005, respectively.  The remainder were filed December 16, 2005.

inequities.  At that time, the company was involved in several Equal Employment Opportunity Commission cases with ex-employees complaining about Garza.  Lombard and Esskew investigated Luckett's complaints and counseled Garza on some of the issues.

On March 15, 2005, Garza gave Luckett a poor review, with the lowest ratings available. As a result, Lombard placed Luckett on a sixty-day Performance Improvement Plan.  One of the issues for which Luckett was cited was training.  Specifically, the review read, "Greg's performance has been unsatisfactory in the areas of . . . Training. . . .  Training scores must also improve as Hattiesburg['s] were below company's expectations for last quarter and up to Feb. 2005.  Training must be scheduled and all necessary training materials must be ordered."  (Def.'s Summ. J. Mot. Ex. A at 138).  Luckett was told, "If no improvement occurs during this time, further disciplinary action up to and including termination may occur."  *Id.*  He then went on sick leave from March 27 until June 27, 2005.

After he returned, he was ordered to conduct Department Supervisor Training for several of the store's department supervisors.  The training included a test.  Luckett gave what he described as an open book test.  On or about August 21, 2005, Lombard told him he was fired, because he gave the department supervisors the answers to the test.

Aggrieved, Luckett filed a complaint with the EEOC.  The EEOC issued a right to sue letter on September 28, 2005.  Luckett filed the instant action on December 16, 2005.

## DISCUSSION

### STANDARD FOR MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56:

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

3

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56. To make this determination, the Court must view the evidence in the light most favorable to the non-moving party. *Abarca v. Metro. Transit. Auth.*, 404 F.3d 938, 940 (5th Cir. 2005). A "material fact" is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute about a material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* The party that bears the burden of proof at trial also bears the burden of proof at the summary judgment stage. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986). "[W]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon . . . mere allegations or denials . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

DISPARATE TREATMENT

Luckett claims disparate treatment on account of his race in his pay, pay raise, and termination.

I.      PAY AND PAY RAISE

Home Depot argues that the disparate pay and raise claims fail, because Luckett admitted he had no problem with his pay. Luckett does not address these claims in his opposition to summary judgment.

To establish his prima facie case for disparate treatment in his pay, Luckett must prove, (1) he is part of a protected class and (2) was paid less than others outside that class for substantially similar work. *Uviedo v. Steves Sash & Door Co.*, 738 F.2d 1425, 1431 (5th Cir.

1984).  Luckett testified that he had no complaints about his pay.  He did testify that human resources managers in all other districts for Home Depot were paid more than those in his district.  Lombard testified that the human resources managers in Luckett's district were comprised of sixteen Caucasians and eight African-Americans.  However, there is no evidence of the racial makeup of the human resources managers in the remaining districts.

As for the disparate pay raise claim, Luckett does not provide evidence that he received a lesser wage increase than any of his colleagues.  Because there is no genuine dispute of material fact, Home Depot is entitled to summary judgment on Luckett's disparate pay and raise claims.

II.    TERMINATION

To establish Luckett's prima facie case of discriminatory discharge, he must prove: (1) he is a member of a protected class, (2) he was qualified for the position held, (3) he was fired, and (4) was either replaced by someone outside of his protected class, or treated less favorably than similarly situated employees outside of his protected class.  *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005).  Luckett may prove his discrimination claim with direct or circumstantial evidence.  *Id.*

It is undisputed that Luckett, as an African-American, is a member of a protected class. He had prior management and human resources experience.  Additionally, he had been employed with Home Depot as a human resources manager for over two years.  It is undisputed that he was terminated and replaced by Terry Spiers, a Caucasian.

Once the plaintiff satisfies his prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for its actions.  *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 802 (1973).  If the defendant does so, the burden is shifted back to the plaintiff to rebut the defendant's explanation.  *Id.* at 804.  Particularly, the plaintiff must show (1) the reason is a pretext for unlawful discrimination, or (2) the "reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic."  *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411-12 (5th Cir. 2007).

Home Depot asserts that Luckett was fired because of "his own falsification of Home Depot training records and his poor performance."  (Def.'s Summ. J. Memo. at 2). Specifically, he was accused of giving the answers to the Department Supervisor Training test and crediting trainees for more hours of training than was attended.

Luckett responds that this reason is a pretext for race discrimination.  He points to evidence of disparate treatment of other African-American employees, and to racial slurs allegedly made by Garza.

Proof of pretext cannot rest on "statements by nondecision-makers or statements by decisionmakers unrelated to the decisional process itself."  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989).  The "mere utterance of a racial epithet is not indicia of discrimination under Title VII."  *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 329 (5th Cir. 1998).  Such remarks may only serve as sufficient evidence of discrimination if they are "(1) related [to the employee's protected characteristic,] (2) proximate in time to the [adverse employment action,] (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue."  *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996).

6

For example, the Fifth Circuit reversed a verdict for an employee where the only evidence of pretext was a comment that "There are different standards for males and females." *Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 254 (5th Cir. 1999).  It was insufficient evidence of gender discrimination, because it was made by a non-decision maker two years before the denial of tenure.  *Id.* at 256.  In another case, the Fifth Circuit held that two comments in five years referring to plaintiff as "Buckwheat" and "porch monkey" were insufficient evidence of race discrimination.  *Boyd*, 158 F.3d at 329-30.  They were made by the decision maker one year prior to his decision not to promote the plaintiff.  *Id.* at 330. Further, there was no evidence of a causal connection between these comments and the decision.  *Id.*

Luckett presents evidence of several racial comments, which the Court examines in turn.

### A.    "Nigger joke"

First Luckett mentions that Garza made a "nigger joke" in a meeting with him and operations manager Gredwood Poole (African-American).  (Luckett Depo. Vol. I at 73-74). Luckett testified:

> No, I didn't allow him to tell the joke, okay?  What it was, he started and he said he was going to tell this joke.  And he got about halfway through the joke and I jumped up when he used the word nigger, okay?
>
> Q.    Do you recall what the context was of when he used the word nigger?
>
> A.    It was through the joke.  It was about three ethnic groups, and one of them being black, and he had to be a nigger.
>
> Q.    What were the other groups?

> A.   I think the joke started with–I know it was one white guy and the other one I think was either Chinese or Japanese.
>
> Q.   Was there any other word used for the Chinese guy?
>
> A.   No.
>
> Q.   Or the white guy?
>
> A.   No.
> . . . .
>
> I was–the thing is, that when the word nigger came up, I was appalled by it. And I jumped up. We were sitting at the conference table, and I jumped up. I looked at Gredwood first. When the word nigger, I looked at Gredwood. I was looking to see if I was going to get a response from Gredwood. I looked at him and he dropped his head. And I jumped up and I said, you know, I don't like that. And I went on to explain to him is that I took offense to it. And I walked out the conference room.
> . . . .
>
> Maybe 30 or 40 minutes he came in, him and Gredwood, and he responded–the response was that, You guys use it. And I alluded to him that it was not acceptable at Home Depot and that was the first time and that would be the last time, the next time I would report it.

*Id.* at 74-76.

This occurred within three weeks of arriving in Hattiesburg in June 2004.

The joke was related to Luckett's race. There is evidence that Garza was a decision maker in Luckett's termination. However, the joke was made over a year before and was not related to his termination.

> B.   "String him up."

Luckett testified that Mark Vizy, while working at the Gulfport Home Depot as a department supervisor told him, "one day . . . all the supervisors were in there and you walked out the office, and George said, You know, I'd like to take him outside and string

him up." (Luckett Depo. Vol. II at 316). There is no evidence of when this statement was made, or in what context, i.e., whether it was related to his termination.

C.     Dragging comment

Vizy testified about a delay in his pay increase after he was promoted to department manager in the Hattiesburg store. His promotion occurred in September 2004. When his corresponding pay increase "didn't happen on the day [he] thought it should," he confronted Luckett and Garza. (Vizy Depo. at 58). Luckett and Garza each blamed the other. Vizy testified Garza asked Luckett, "Why didn't you get it done, you dumb nigger?" *Id.* at 112. After that:

> Well, then George kept saying, "Well, it's Greg's fault. You want to drag[3] him behind your pickup truck in the parking lot."
>
> And I said, "No, I'm not that type of person." And he kept–George kept egging me on trying to see if I would get mad at Greg, and I wouldn't.
>
> And then shortly after that Greg–or George came up to me and asked if I felt Greg was doing his job, was Greg giving me the information I needed in a timely manner, was he following up on requests that I had asked on my associates that worked for me. And when I replied yes, he said, "Well, has he been doing it the whole entire time that he's been HR?"
>
> . . . . And I feel that it was more of a way to see if I would roll over on Greg to say that he wasn't doing his job.

*Id.* at 58-59. He later testified that at the time of the dragging comment, "Greg was sitting right next to me, and Greg thought I was really mad at him. He told me later on he was afraid I was going to hurt him. . . . He said, 'Well, George told me you would.'" *Id.* at 75. "Greg was concerned about me wanting to retaliate in some way because of the fact my

---

[3]Elsewhere, Vizy testified Garza followed this statement with, "You know that's what they do with niggers down here in the south." *Id.* at 76.

raise was not processed in time." *Id.* at 113.

Again, this comment refers to Luckett's race and is made by a decision maker.  It was made eleven months prior to his termination and was not related to his termination.

D.    Feud

John Dryman testified that there was a "big Garza-Luckett-Roson feud."  (Dryman Depo. at 45).  He described the feud:

> Well, Garza coming in there saying he's going to fire this one's ass.  I shouldn't be cussing should I?  Okay.  Garza coming in there, you know, saying he's going to fire this one's ass, that Luckett's a dumb ass *hmm hmm hmm hmm*.  And then Tim Roson [Luckett's inferior] would chime in with his BS and say Greg Luckett's a dumb ass–a D-A-N, okay?  That's something–do you know what that stands for?

*Id.* at 45-46.  Dryman also testified that when Luckett went on medical leave after receiving his poor review from Garza, Garza referred to Luckett as a "black bastard."  *Id.* at 54.  According to Dryman, Garza said that Luckett "was a dumb ass and he needed to be fired, his black ass didn't know what he was doing."  *Id.* at 58.

From this testimony, these comments were made proximate in time to Luckett's termination.  Luckett and Garza's testimonies further corroborate the timing of this feud.  The comments are related to Luckett's race, made by a decision maker in his termination and appear to be related to his termination.  It is undisputed that Garza wrote the poor review that placed Luckett on the sixty-day performance improvement plan ("PIP").  Lombard testified she relied solely on Garza's review when she decided to place Luckett on PIP.

Moreover, taken as a whole, the comments and conduct attributed to Garza display a pattern of racial animus directed at Luckett.  Without question, the final "feud" comments

are sufficient evidence that Luckett was terminated because of his race.  These comments go well beyond mere boorish or insensitive speech in the workplace.  And when they are considered in light of the pattern of racial derision that began when Luckett first came to Hattiesburg, they provide a sufficient basis for a reasonable jury to conclude that Luckett's race was at minimum, a motivating factor in his termination.

HOSTILE WORK ENVIRONMENT

To prove his hostile work environment claim, Luckett must show that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of his employment; and (5) his employer knew or should have known of the harassment and failed to take prompt remedial action.  *Equal Employment Opportunity Comm'n v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007).  For harassment to be sufficiently severe and pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive.  *Id.*

The Court is not limited to considering harassment that singled out Luckett, but must also consider harassment of his fellow African-American employees.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 19 (1993); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 696 (4th Cir. 2007); *Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007); *Madison v. IBP, Inc.*, 257 F.3d 780, 793 (8th Cir. 2001) (overruled on other grounds); *Jackson v. Quanex Corp.*, 191 F.3d 647, 660-61 (6th Cir. 1999).  This is true, whether Luckett personally witnessed the instances or learned about them second hand while he was employed there.  *Id.* at 661.  However, second hand harassment is considered "less objectionable than harassment directed at the plaintiff."  *Jennings*, 444 F.3d at

11

272.

To determine whether the conduct is objectively offensive the Court must consider the totality of the circumstances, including (1) the frequency of the conduct, (2) its severity, (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance.  *WC&M*, 496 F.3d at 399.  These are considered factors only.  *Id.* at 399-400.  Therefore, "a single incident . . . if sufficiently severe, could give rise to a viable Title VII claim, as well as a continuous pattern of much less severe incidents of harassment."  *Id.* at 400.

Besides the comments discussed previously, Luckett complains of other racial slurs, stereotypes, and that lower African-American employees were subject to disparate treatment.  For example, he testified that associate Tracy Morgan, "brought it to my attention that [department supervisor Tony Khodaverdi] came in one day after I had disciplined him and he was talking with the employees in his department and referred to me as the 'N' word." (Luckett Depo. Vol. I at 81).  Because none of the other witnesses corroborated Morgan's story, Luckett discussed it with one of his superiors and was told to make a note and put it in Morgan and Khodaverdi's files.

Luckett testified that Garza targeted Suzette Carpenter as "a white sympathizer" of the African-American employees.  *Id.* at 142-43.  However, it is unclear of what that targeting consisted.

Luckett testified that on several occasions Garza expressed to him and other employees that "he had a problem with blacks with high education."  *Id.* at 143-45.  These occurred in store meetings and management meetings.

Luckett investigated an incident in which Roson was accused of making a "racist remark" to an African-American employee Johnny Courtney that "that's why blacks can't get ahead, because there are other blacks pulling them down." *Id.* at 194-98.  Roson was suspended while the complaint was investigated. *Id.* at 195.  Luckett wrote the incident up in Roson's file and counseled him that the statement was not politically correct. *Id.* at 197.  However, Luckett testified he did not interpret the remark as racially derogatory. *Id.* at 198.  Luckett testified that Roson "from that point on . . . was kind of . . .walked quietly in the store." *Id.* at 199.

It was brought to Luckett's attention that Garza told Khodaverdi to "Tell that nigger [Courtney] he didn't hurt his butt, he hurt his finger, and he needs to stand up." *Id.* at 199-200. Alice Smith witnessed Garza make this statement.  (Smith Aff. at 1).

There is evidence that other African-American employees were being paid less and receiving smaller raises than their Caucasian colleagues, and were being passed up for promotions and jobs in favor of other races.  Luckett testified that African-American employees were receiving raises of thirty-five to forty cents per hour while Caucasian employees received raises of five, six, and eight dollars per hour.  Luckett brought this to the attention of his superiors.  Luckett "saw a pattern" that made him feel that Garza was making decisions based upon race.  (Luckett Depo. Vol. II at 335).

After Luckett left, he heard that Garza used to bad mouth him to the other managers when Luckett would leave a meeting, calling him a "pathetic H.R., I was a half H.R."  It was then that Luckett learned about the "string him up" comment. *Id.* at 316.

Luckett testified that he was told by the Denham Springs manager, by District Manager Patrick Baker, and by Garza that Baker did not like Luckett.  He was told that Baker had been

terminated from a prior job by an African-American human resource manager for sexual harassment. Baker would "always" point his hand as if it were a gun and pretend to shoot Luckett. *Id.* at 357. He also claimed that on several occasions at the store and at district meetings in Slidell, Baker said, "You know you ain't going to be here long, buddy, you're on the bubble." *Id.*

Luckett testified that he began to experience anxiety and stress, associated with this conduct. This eventually manifested itself into physical symptoms, required hospitalization, and was the basis of his eventual medical leave in March of that year.

A jury could conclude that he was subjected to unwelcome harassment on account of his race. With the exception of Roson's comment, this evidence indicates that Luckett perceived that the conduct was offensive. The dragging comment and Baker's "shooting" appear physically threatening and severe. This coupled with the frequency of the remaining humiliating and lesser offensive activity creates a dispute of fact as to whether the harassment was objectively offensive as well, so as to alter the terms of Luckett's employment. Finally, there is evidence that Home Depot knew or should have known about the hostile environment but failed to take prompt remedial action.

RETALIATION

Luckett claims he was denied a wage increase, subject to unwarranted discipline, and terminated in part for his efforts in reporting the racially discriminatory conduct in the Hattiesburg store. Home Depot argues that this claim should be dismissed for failure to exhaust administrative remedies. In the alternative, Home Depot asserts that there is no causal connection between the adverse employment actions and Luckett's Title VII conduct.

14

I.        EXHAUSTION OF ADMINISTRATIVE REMEDIES

As Home Depot points out, Luckett did not mark the "retaliation" box on his form
EEOC complaint.  (Compl. Ex. A at 3).  However, in the text of the EEOC charge, he
sufficiently stated a claim of retaliation for his efforts in combating racial discrimination in
the store.  *Id.* at 4-6.  Therefore, the issue was placed before the Commission, and is now
properly before this Court.

II.       MERITS OF THE RETALIATION CLAIM

To establish a prima facie case of retaliation, he must show (1) he engaged in
statutorily protected activity, (2) he suffered an adverse employment action, and (3) there is
a causal connection between the protected activity and the adverse employment action.
*Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir. 1995).  Home Depot
challenges whether the third prong is met.

The causal link required by the third prong of the prima facie case does not rise to the
level of a "but for" standard.  *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir.
2002).  In fact, to establish a prima facie case, a plaintiff need only make a very minimal
showing.  *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996).  "Close timing
between an employee's protected activity and an adverse action against him may provide the
'causal connection' required to make out a prima facie case of retaliation."  *Swanson v. Gen.
Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997).  For example, a time lapse of four
months has been held sufficient to meet the prima facie case on summary judgment.  *Evans
v. City of Houston*, 246 F.3d 344, 345 (5th Cir. 2001).

Luckett testified he began reporting Garza's discriminatory conduct in January 2005.

15

On March 15, 2005, Garza gave Luckett his first negative performance review, which gave Luckett the lowest scores in all performance categories.  It is undisputed that good performance reviews resulted in wage increases and negative reviews did not.  According to Luckett, Lombard relied solely on Garza's representations and placed Luckett on a sixty-day performance improvement plan.  Within sixty-six days[4], Luckett was fired.

Once the prima facie case is established, the burden falls to the defendant to articulate a nondiscriminatory reason for the adverse employment action.  *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir. 1992).  "In addition, . . . where there is close timing . . . the employer must offer a 'legitimate, nondiscriminatory reason that explains both the adverse action *and the timing*.'"  *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999) (quoting *Swanson*, 110 F.3d at 1188)).  As previously discussed, Home Depot argues that Luckett was terminated for a combination of his past poor performance, giving out test answers, and falsifying training attendance records.

Next, the employee assumes the burden of showing that the reason given was a pretext for retaliation.  *Id.*  This does involve "but for" causation.  *Strong v. Univ. Health Care Sys., L.L.C.*, 482 F.3d 802, 806 (5th Cir. 2007).   In other words, Luckett must show he would not have suffered the adverse employment action "but for" his protected activity.  *Id.*  "The timing of the adverse employment action can be a significant, although not necessarily determinative factor."  *Mayberry*, 55 F.3d at 1092.  "[T]emporal proximity alone is insufficient to prove but for causation."  *Strong*, 482 F.3d at 808.  However, temporal proximity coupled with evidence that the proffered reason is a pretext will suffice to survive

---

[4]This excludes the time Luckett was out on medical leave.

summary judgment. *Shackelford*, 190 F.3d at 409.

Luckett testified that Garza had drafted an earlier version of the performance review in which Garza gave Luckett a rating of excellent.  Luckett warned Garza that he was exposing the store to potential liability for discrimination.  The store was currently involved in EEOC cases based on complaints about Garza.  According to Luckett, Garza announced in a store meeting that if he found out someone had complained to upper management about him he would find out who they were and "run [them] into the corner" "like a roach." (Luckett Depo. Vol. I at 165).  Luckett emailed all of his concerns about Garza's conduct to his superiors.  Lombard and De La Pena came to the store in February to investigate various complaints.  Thereafter, Luckett discovered Poole at Luckett's computer reading Luckett's sent emails.  Poole told Luckett that Garza had instructed Poole to read Luckett's emails. On March 15, Luckett received the poor performance evaluation, which caused Lombard to place him on the sixty-day plan.  Afterwards is when Vizy heard Garza cursing and repeatedly stating that Luckett needed to be fired.

Luckett was then ordered to perform in store training of his department supervisors. Luckett and John Dolese testified that this usually occurred off-site by others.  Luckett said he was provided no training materials.  He had to go to the Baton Rouge store to obtain and pay for the training materials himself.  He claimed he was never trained on how to train the department supervisors.  Luckett was thereafter fired and told it was for mishandling the training session.

Garza testified that he championed Luckett, but Garza's superiors had set Luckett up to fail.  Garza's superiors told him that Luckett was transferred to Hattiesburg, "because he

was trying to pin his manager for sexual harassment that never happened." (Garza Depo. at 74). Garza claimed that his superiors knew the training for which Luckett was fired took place prior to the improvement plan, not after. Nevertheless, it was his superiors' idea to discipline and terminate Luckett.

This creates a genuine dispute of fact as to whether Home Depot, through Garza or his superiors, retaliated against Luckett in violation of Title VII.

§1981

Luckett likewise brings a claim under section 1981 for disparate treatment, hostile work environment, and retaliation. The analysis is the same under both section 1981 and Title VII. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 (5th Cir. 2004). The only difference is that a section 1981 claim "is not constrained by the administrative prerequisites [applicable to] Title VII claims." *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000) (overruled on other grounds). Therefore the Court incorporates by reference the previous sections discussing these claims under Title VII.

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Finally, Luckett charges Home Depot with intentional infliction of emotional distress on the basis of its discriminatory and retaliatory conduct. Home Depot argues that Luckett cannot show outrageous and extreme conduct.

Under Mississippi law, a party may recover for intentional infliction of emotional distress "where there is something about the defendant's conduct which evokes outrage or revulsion." *Franklin Collection Serv., Inc. v. Kyle*, 955 So. 2d 284, 290 (¶20) (Miss. 2007). "The standard is whether the defendant's behavior is malicious, intentional, willful, wanton,

18

grossly careless, indifferent or reckless." *Id.* at 290-91.

For example, in *Jones v. Fluor Daniel Services Corp.*, 959 So. 2d 1044 (Miss. 2007), the Mississippi Supreme Court examined an intentional infliction of emotional distress claim based on discriminatory conduct.  Plaintiffs were African-American ex-employees of Flour Daniel.  *Id.* at 1045 (¶2).  A supervisor, speaking in Spanish to Mexican workers in front of Plaintiffs said the word "monkey" in English.  *Id.* at (¶3).  Jones asked the supervisor to repeat what he said.  *Id.*  The supervisor told him in English that he said "The monkeys could go to work or go to the rope."  *Id.*  The supervisor told Plaintiffs that someone in the office had directed him to make this comment.  *Id.*  The court held that the racial slur "coupled with an apparent reference to lynching could permit a reasonable juror to conclude that [the] comment was outrageous and revolting."  *Id.* at 1049 (¶19).  The court further noted that racial slurs spoken by a supervisor to a subordinate could lead a reasonable juror to conclude that the conduct was extreme and outrageous, "given the power dynamics of the workplace."  *Id.* at (¶20).

*Jones* compels the conclusion that there is a dispute of fact as to whether Home Depot's conduct sufficiently evokes outrage and revulsion.  First, evidence of the dragging comment, prefaced by "Why didn't you get it done, you dumb nigger?" and followed by, "That's what they do to niggers down here in the south" suffices.   Second, Garza was Luckett's supervisor, and he claims Garza used racial slurs in front of and directed towards Luckett.

**IT IS THEREFORE ORDERED AND ADJUDGED,** that for the reasons stated above, Defendant's [77] Motion for Summary Judgment on the issues of disparate treatment in pay and pay raise is **GRANTED.**

19

**IT IS FURTHER ORDERED AND ADJUDGED,** that for the reasons stated above, Defendant's motion on the remaining issues is **DENIED.**

**IT IS FURTHER ORDERED AND ADJUDGED**, that Defendant's [105] Motion to Strike is **DENIED**.

**SO ORDERED AND ADJUDGED** this the 5th day of December, 2007.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE